IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Dayna Newton, | Case No. 3:10 CV 640 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Ohio Department of Rehabilitation and Correction-Toledo Correctional Institution, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Dayna Newton brings this action against her former employer, the Ohio Department of Rehabilitation and Correction ("ODRC") alleging she was sexually harassed by a co-employee at the Toledo Correctional Institution ("TCI") in February 2009, and Defendant failed to take prompt corrective action. Plaintiff also alleges Defendant unlawfully retaliated when it subsequently terminated her employment.

This matter is now before the Court on Defendant's Motion for Summary Judgment (Doc. No. 38). Plaintiff opposed (Doc. No. 41) and Defendant replied (Doc. No. 42).

## BACKGROUND

Plaintiff worked for Defendant ODRC as a Correctional Officer ("CO") until her termination in June 2009 (Doc. No. 28-5, at 1).[1] Plaintiff worked in the Delta 1 Control Room where her duties

---

[1] Record citations are to the CM/ECF document number followed by the .pdf page number.

included monitoring the flow of traffic between cell blocks; monitoring the flow of inmate movement through hallways and stairways; remotely locking and unlocking approximately seventeen to twenty doors; monitoring radio traffic; testing the "man-down" alarms to ensure the locks were working properly; and distributing batteries to other COs for their radios (Doc. No. 28-1, at 6–8).

In February 2009, Sergeant Kevin Logan ("Logan") approached the Control Room and requested entry (Doc. No. 28-1, at 22–23). Once inside, Logan began speaking to Plaintiff about an inmate with whom there had been problems and whether or not the inmate should be moved (Doc. No. 28-1, at 24–25). During the conversation, Logan approached Plaintiff from behind and began rubbing her shoulders (Doc. No. 28-2, at 1). Plaintiff testified the rubbing lasted for approximately five seconds, but told Trooper Stacy Stidham, who later investigated the matter, it went on for about two to three minutes (Doc. No. 28-2, at 2; Doc. No. 38-12, at 3). Plaintiff admits the "massage" was consensual, at least until Logan began to massage her front shoulder blades when she gave him a look and he removed his hands (Doc. No. 28-2, at 2; Doc. No. 38-12, at 4). Plaintiff also claims that Logan was making sounds simulating a sexual act while rubbing her shoulders, which Logan denied (Doc. No. 28-2, at 3; Doc. No. 38-9, at 11; Doc. No. 38-10, at 7; Doc. No. 38-2, at 10).

Plaintiff then asked CO Shannon Kocsis, over the load speaker, to relieve her so that she could use the restroom (Doc. No. 28-2, at 4). Kocsis arrived at the door to the Control Room approximately ten to fifteen minutes later (Doc. No. 38-4, at 1). During that interval, Logan and Plaintiff continued discussing the inmate situation. Logan asked Plaintiff: "[H]ow bad do you want him moved?" (Doc. No. 28-2, at 6), after which Logan came up beside her, grabbed her by the wrist, swiped her hand across his groin area, unzipped his pants and then ejaculated into her hand (Doc. No. 28-2, at 6, 9–10).

2

Logan's story differs. He claims he and Plaintiff began discussing a "shirt keeper" -- a suspender-like device connecting his shirt to socks to keep a shirt tucked in tightly -- and that he unzipped his pants to show his keeper (but no more) (Doc. No. 31-3, at 25). Plaintiff then reached back, placed her hand on his crotch and began massaging his groin area until he eventually ejaculated (Doc. No. 31-3, at 25; Doc. No. 31-4, at 3–4, 6).

Soon after Logan ejaculated, Kocsis arrived at the Control Room to relieve Plaintiff (Doc. No. 28-2, at 11). Kocsis pushed the buzzer for entry and waited for Plaintiff to open the door. Plaintiff claims she let Kocsis in as soon as she heard the buzzer (Doc. No. 28-2, at 11–12), but Kocsis stated that she waited outside the locked Control Room door for a couple minutes before Plaintiff let her in (Doc. No. 38-4, at 1). When Kocsis entered, she did not notice anything unusual, and Plaintiff did not appear upset or mention anything regarding the incident with Logan (Doc. No. 38-4, at 1). Plaintiff states that she sat holding Logan's semen in her hand for three to four minutes while Kocsis talked about another situation (Doc. No. 38-2, at 19). When Logan left, Plaintiff left to go to the restroom where she placed the semen in a plastic bag leftover from her lunch, then washed her hands and returned to the Control Room to resume her post (Doc. No. 38-2, at 19).

Plaintiff next called CO Candace Whitmore for advice, and Whitmore told her she needed to report the incident (Doc. No. 28-2, at 14–15). Plaintiff then called Master Control to report the incident and spoke to CO Schaber-Goa, who advised her to call Trooper Stacy Stidham (Doc. No. 28-2, at 15–16), an Ohio State Highway Patrolman assigned to handle criminal matters at TCI (Doc. No. 38-12, at 1). Plaintiff called, did not get an answer, but noticed Lieutenant Henderson entering the shift office (Doc. No. 28-2, at 16). Plaintiff called Henderson and asked her to come to the Control Room to talk (Doc. No. 28-2, at 16–17). Plaintiff told her about the incident with Logan and showed

3

her the plastic bag containing his semen (Doc. No. 28-2, at 16–17). Henderson told her that was Logan's "M.O." and Plaintiff should report the incident (Doc. No. 28-2, at 17).

Plaintiff was then relieved from her duties to allow her to complete an incident report (Doc. No. 28-2, at 17–18). Plaintiff was later interviewed by Trooper Stidham (Doc. No. 28-2, at 23). Plaintiff told Stidham what occurred, admitting she never told Logan his actions were inappropriate or unwanted and that the massage was consensual, but stated she looked at him as if to say "what is wrong with you" when he moved his hands closer to her breasts (Doc. No. 38-12, at 3–5).

Plaintiff next met with TCI Victim Coordinator Meredith Rinna, who spoke to Plaintiff about victim's rights and asked if she would like to meet with someone from the Critical Incident Support Team ("Support Team") (Doc. No. 28-3, at 18–19). Plaintiff then met with Cindy Terrazas, a member of the Support Team, who told her about the Employee Assistance Program available to her (Doc. No. 28-3, at 19).

Plaintiff also met with Warden Robert Welch, who apologized for the incident and told Plaintiff she could take some paid time off on administrative leave, which Plaintiff understood was to gather herself or receive any help she felt was needed (Doc. No. 28-3, at 19–20).

After Plaintiff initially reported the incident, Logan was told to go to the personnel office where he was sequestered in a room (Doc. No. 31-4, at 11–12). Trooper Stidham then met with Logan and described Plaintiff's incident report to him (Doc. No. 31-4, at 14). Stidham attempted to question Logan after giving him his Miranda rights, but Logan refused (Doc. No. 38-12, at 2). Immediately thereafter, Logan was placed on administrative leave (Doc. No. 31-4, at 16).

Sean Bowerman investigated the incident for TCI by reviewing all the incident reports and questioning the individuals involved (Doc. No. 38-1, at 2). In the course of his investigation, Bowerman found that the cameras in the Control Room were not operational at the time of the incident, and determined Plaintiff would have been aware of this fact due to the nature of her duties (Doc. No. 38-1, at 2). Bowerman found Logan to be cooperative and forthcoming in his interview, but felt that Plaintiff was evasive and had inconsistencies in her story (Doc. No. 38-1, at 2). At the conclusion of his investigation, Bowerman submitted a report to Warden Welch with his findings, stating he believed the incident between Logan and Plaintiff was consensual (Doc. No. 38-1, at 2). Logan was terminated and, after filing a grievance with the union, accepted ODRC's offer to convert the removal to a resignation (Doc. No. 31-11, at 1–3).

On March 15, 2009, and prior to the completion of Bowerman's investigation, Plaintiff filed a charge with the Ohio Civil Rights Commission ("OCRC") claiming that her removal was in retaliation for her report of the incident in February 2009 (Doc. No. 28-25, at 1). Plaintiff was subsequently served with a Pre-Disciplinary Conference notice in May 2009, alleging she violated rules of the ODRC's Standards of Employee Conduct, and that a hearing would be conducted (Doc. No. 28-20, at 1–3). Later that month, Plaintiff attended a Pre-Disciplinary Conference with her union representative (Doc. No. 28-21, at 1). The hearing officer determined there was just cause to find Plaintiff had violated ODRC rules. Welch ultimately determined, after reviewing Bowerman's report, the hearing officer findings and other documentation, to terminate Plaintiff for violating the ODRC Standards of Employee Conduct, effective June 25, 2009 (Doc. No. 28-23, at 1). Furthermore, criminal complaints for dereliction of duty were filed against both Plaintiff and Logan in the Toledo Municipal Court (Doc. No. 38-12, at 2; 38-16, at 11), and in September 2009, Plaintiff pled no contest

to an amended charge of attempted dereliction of duty (Doc. No. 28-4, at 17). Plaintiff grieved her termination, and went to arbitration in November 2009 (Doc. No. 28-28, at 1). The arbitrator determined that the sexual act between Logan and Plaintiff was consensual, that the ODRC conducted a fair and objective investigation, and found by clear and convincing evidence that there was just cause for Plaintiff's termination (Doc. No. 28-28, at 9–10). Plaintiff subsequently filed this lawsuit.

## DISCUSSION

### Standard of Review

Federal Civil Rule 56(c) states summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, this Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, it determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

### Logan's Relationship to Plaintiff

As an initial matter, this Court must resolve whether Logan was Plaintiff's supervisor or whether he was her co-worker. A supervisor is "an individual who serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment." *Summerville v. Ross/Abbott Labs*, 1999 WL 623786, at *7 (6th Cir. 1999). The significance of this distinction is that Plaintiff carries a slightly different burden depending on how Logan is classified. For Defendant, this has particular significance because if Logan is classified as Plaintiff's supervisor,

6

it can be held vicariously liable for Logan's actions. *See Williams v. GM Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (setting forth the elements of sexual harassment by a supervisor). Not surprisingly, the parties differ on Logan's employment status: Plaintiff maintains Logan was her supervisor while Defendant contends Logan was simply Plaintiff's co-worker.

In support of her position, Plaintiff states that Logan was responsible, along with other sergeants, for watching over the COs, and if a CO was not performing his or her duties satisfactorily, Logan could report that CO to Logan's lieutenant. Plaintiff also points out that sergeants and COs wore different colored shirts and badges and, as a sergeant, Logan had authority to transfer inmates, a power not given to COs (Doc. No. 41, at 7).

Plaintiff's evidence is weak and largely irrelevant. The relevant inquiry is whether the record evidence shows that Logan had no real authority over Plaintiff or any other CO. At the time of the incident, sergeants, like COs, were part of the union and not part of the hierarchy of authority (Doc. No. 31-1, at 8–9). Logan testified he had no authority -- "none at all" -- over COs (Doc. No. 31-6, at 10). In fact, he had none of the authority usually given a supervisor, including the power to hire, fire, assign, evaluate, or discipline the COs. Finally, when Plaintiff was asked who supervised her at TCI, she did **not** name Logan or any other sergeant (Doc. No. 28-1, at 13–14). This evidence of Logan's actual job duties trumps Plaintiff's evidence of Logan's shirt or badge color. This Court concludes Logan was Plaintiff's co-worker, not her supervisor.

**Hostile Work Environment**

To prevail on her hostile work environment claim, Plaintiff must show that (1) she is a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based on her sex; (4) the harassment unreasonably interfered with her work

7

performance and created a hostile work environment; and (5) Defendant "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Blankenship v. Parke Care Ctrs.*, 123 F.3d 868, 872 (6th Cir. 1997).

Defendant argues Plaintiff cannot prevail on this claim for two reasons: (1) the sexual contact between Plaintiff and Logan was consensual; and (2) Plaintiff cannot show Defendant knew or should have known of Logan's propensity to harass women and that Defendant failed to take reasonable corrective action. Because the Court finds the second reason to be dispositive, it declines to address Defendant's first argument.[2]

**Defendant's Knowledge**

Plaintiff argues that Defendant knew or should have known of Logan's propensity to harass women in the workplace because Logan allegedly exposed himself in 2004 to CO Renee Adams who then took the following actions: she informed Defendant's EEO Officer, Monica Ford; told her shift Captain, Mark Green; filed a complaint with the Ohio Department of Administrative Services Equal Opportunity Division ("DAS/EOD"); and also filed a charge with the OCRC. Plaintiff also claims it was "common knowledge" at TCI that Logan exposed himself to Adams.

The record evidence shows otherwise. To begin, the only complaint Adams made to Ford, supported by the record, is that "Logan had been harassing her" (Doc. No. 38-5, at 1). Adams provided no other details. Pursuant to ODRC practice, Ford then gave Adams the proper forms to file

---

[2] This Court has carefully reviewed the record and, while the evidence overwhelmingly supports the conclusion that the sexual contact between Plaintiff and Logan was consensual, this Court is not permitted to weigh the evidence or credibility on summary judgment. *Anderson*, 477 U.S. at 248–49. Given the conflict on whether Logan's advances were welcomed, a disputed issue of material fact exists.

a complaint against Logan, but there is no evidence Adams ever pursued an internal ODRC complaint (Doc. No. 38-8, at 2).

Plaintiff concedes as much, but counters that Adams was not required to file a formal, written complaint to trigger Defendant's notice of Logan's behavior. She asserts Adams's oral complaint was enough. Even accepting that proposition, Adams's general statement that Logan was "harassing her" is insufficient to put Defendant on notice. As the Supreme Court recently stated, albeit in a different context, a valid oral complaint "must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context . . . ." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335 (2011). A statement that Logan was "harassing her" falls well short of this standard. Without further detail, Defendant could not judge the seriousness or immediacy of Adams's complaint or determine what appropriate corrective action to take. To put Defendant on notice of Logan's actions, Adams had to provide more detail.

Nor is there any evidence Adams advised Green of this incident. Green denies ever receiving a "formal or informal complaint of harassment" from Adams (Doc. No. 38-7, at 1), and Plaintiff offers no evidence rebutting this assertion. Similarly, there is no record Adams filed a complaint with the DAS/EOD (Doc. No. 38-6, at 1). The custodian of records for DAS performed a records search but found no evidence Adams filed such a complaint (*id.*).

Plaintiff also alleges that Adams filed a charge with the OCRC, describing the incident in her charging party affidavit. While Adams did apparently file a charge with the OCRC, the document states that the charging party affidavit "will not be included with the charge sent to the Respondent. This information is for use by the Commission during the investigation" (Doc. No. 28-29, at 4). There is no evidence Defendant received Adams's description. Furthermore, Adams did not mention

9

Logan's name in any other part of her OCRC complaint. Clearly, the OCRC complaint could not put Defendant on notice of Logan's behavior if it never identified him, by name or otherwise.

Finally, Plaintiff asserts that it was "common knowledge" at TCI that Logan exposed himself to Adams, and this places Defendant on notice of his behavior. This alleged incident, however, amounts to little more than conjecture without record support. Such scuttlebutt is insufficient to overcome summary judgment, as it is well-settled that "rumors, conclusory allegations and subjective beliefs [] are wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992). Moreover, these two incidents allegedly occurred five to six years apart, meaning the alleged incident involving Adams offers little probative value to Plaintiff's hostile work environment claim. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 337 (6th Cir. 2008) ("The further back in time the prior act occurred, in other words, the weaker the inference that the act bears a relationship to the current working environment.").

**Corrective Action**

To prevail on her hostile work environment claim, Plaintiff must also show that Defendant failed to respond to her complaint with prompt and appropriate corrective action. In responding to coworker harassment, an employer is liable only if "its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Blankenship*, 123 F.3d at 872–73.

Plaintiff fails to satisfy this standard. Defendant promptly responded to Plaintiff's complaint. After Plaintiff called the shift commander to report the incident, Lieutenant Henderson came to the Control Room, spoke with Plaintiff and secured the semen evidence. Plaintiff was then relieved of her duties, separated from Logan and taken to a conference room in the administrative office area.

10

There, she filled out an incident report, while incident reports were collected from others. Trooper Stidham was also called to investigate the potentially criminal acts of Logan and interview Plaintiff and Logan. Plaintiff then met with Meredith Rinna, the victim coordinator, and Support Team member Cindy Terrazas. Finally, Plaintiff met with Warden Welch, who apologized for the incident, and put Plaintiff on administrative leave to allow Plaintiff time to seek any help she needed. Defendant then conducted an investigation into the incident, and Plaintiff was only terminated after Bowerman's investigation concluded the incident was consensual. Plaintiff has not offered what additional steps Defendant should have taken. Defendant's response was more than adequate.

Plaintiff counters that Defendant immediately treated her as a wrongdoer by placing her on administrative leave and because Stidham was skeptical of Plaintiff's story. Although Plaintiff now attempts to portray the administrative leave as punitive, she testified she believed the purpose was to gather herself and get any help that she needed (Doc. No. 28-3, at 20). Furthermore, Stidham was not employed by Defendant and was investigating a potential crime. Stidham testified she became skeptical only after Plaintiff evaded questions and inconsistencies appeared in her story. Stidham's investigation in no way makes Defendant's response unreasonable.

Based on this record evidence, this Court finds that no reasonable juror could conclude Defendant knew or should have known of Logan's propensity to harass women in the workplace or that Defendant's response was unreasonable or indifferent. Because Plaintiff cannot meet all of the elements of her hostile work environment claim, it cannot survive summary judgment.

**Retaliation**

Plaintiff also alleges Defendant retaliated against her by terminating her employment because she filed a claim of sexual harassment. To establish a *prima facie* case of retaliation, Plaintiff must

11

show: (1) she engaged in activity protected under Title VII; (2) Defendant knew that she engaged in the protected activity; (3) Defendant subsequently took an adverse, retaliatory action against Plaintiff, or Plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) the protected activity and the adverse action were causally connected. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 736 (6th Cir. 2006). For purposes of its summary judgment motion, Defendant concedes Plaintiff can meet the first three elements (Doc. No. 38, at 24). Therefore, this Court will only address whether Plaintiff's protected activity and the adverse employment action taken against her were causally connected.

Plaintiff argues she satisfies this fourth element because she was immediately placed on administrative leave, effectively eliminating any gap in time between when she filed her charge with the OCRC on March 13, 2009 and when she was terminated on June 25, 2009. In other words, Plaintiff asserts Defendant discriminated against her by placing her on leave. This argument, however, is belied by Plaintiff's own testimony where she admitted she understood the purpose of administrative leave was to allow her time to gather herself and seek any help she needed; it was not a punitive measure (Doc. No. 28-3, at 20). Also, Plaintiff has never asserted, nor put forth any evidence demonstrating, she was ever denied the opportunity to return to work prior to her termination. Simply put, there is no record evidence the administrative leave was retaliatory.

Additionally, during the three-month time period between Plaintiff filing her charge and being terminated, TCI investigator Sean Bowerman submitted his report with supporting documentation to Warden Welch. Bowerman concluded that Plaintiff and Logan engaged in consensual sexual activity. Warden Welch also received Plaintiff's disciplinary file, which included a pre-disciplinary packet, the hearing officer's report finding just cause that Plaintiff violated ODRC rules, and a just cause

worksheet (Doc. No. 38-17, at 2). Warden Welch then reviewed all this information prior to terminating Plaintiff (Doc. No. 38-17, at 2). The conclusions in Bowerman's report, the hearing officer's findings, and other documentation Welch reviewed were the basis for Plaintiff's termination, not the OCRC charge she filed three-months earlier.

This Court finds that no reasonable juror could conclude there was a causal connection between Plaintiff filing a charge with the OCRC and her termination.

## CONCLUSION

Plaintiff's case is built on conjecture and supposition. She has not supported her claims with specific record evidence. For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 38) is granted. The case is dismissed.

IT IS SO ORDERED.

                                                                    s/ *Jack Zouhary*
                                                       JACK ZOUHARY
                                                       U. S. DISTRICT JUDGE

May 19, 2011